

U.S. Department of Justice

*United States Attorney*
*Southern District of New York*

---

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

January 21, 2026

**BY ECF AND EMAIL**
The Honorable Paul G. Gardephe
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

   Re: *United States v. Robert Sensi*, 25 Cr. 663 (PGG)

Dear Judge Gardephe:

  The Government respectfully submits this supplemental letter with respect to defendant Robert Sensi's motion for pretrial release as directed by the Court. As detailed in the Government's previous letter dated January 5, 2026 ("January 5 Letter"), the defendant poses a significant risk of flight and a severe danger to the community. Especially in a case where there is a statutorily mandated presumption that no condition or combination of conditions will reasonably assure the appearance of the defendant and the safety of the community, the Court should continue the defendant's pretrial detention.

  The Government's evidentiary bases for the assertions about which the Court has inquired are set forth below and in the attached exhibits.

  1. **Danger to the Community – The Offense Conduct and The Weight of the Evidence**

  As detailed in the indictment and Government's January 5 Letter, the defendant was a key participant in incredibly serious criminal conduct, specifically a far-reaching conspiracy to launder narcotics proceeds for the Jalisco New Generation Cartel, a/k/a Cartel de Jalisco Nueva Generacion or CJNG ("CJNG"), to facilitate and participate in trafficking large quantities of cocaine for the benefit of CJNG, and to sell millions of dollars' worth of military-grade weapons to CJNG. Unbeknownst to Sensi and his co-conspirators—including his co-defendant, Paul Campo, a former high-level official with the Drug Enforcement Administration ("DEA")—the CJNG representative with whom they negotiated the criminal venture was a confidential source working for the DEA ("CS-1"). Over the course of nearly a year, Sensi and Campo met with CS-1 numerous times to carry out the scheme. In total, Sensi met with CS-1 at least ten times in various locations, including New York City, North Carolina, and Florida, all of which were recorded by CS-1. Additionally, Sensi participated in at least eighteen recorded phone calls, and

CS-1, Sensi, and Campo communicated extensively over the encrypted messaging platform WhatsApp.

**The Money Laundering Conduct**

The defendant's money laundering conduct and the weight of the evidence in support of it demonstrates that the defendant poses a significant danger to the community. Money laundering on behalf of drug cartels poses a unique danger as it furthers the efforts of such organizations to avoid law enforcement scrutiny and to grow their dangerous and violent operations. As described below, Sensi, Campo, and their co-conspirators tapped into a network of international contacts to surreptitiously and quickly launder assets for CJNG.

As detailed in the January 5 Letter, beginning in December 2024, CS-1 was introduced to Sensi and over a series of meetings and phone calls, Sensi conveyed to CS-1, in substance and in part, that his DEA-connected friend—Paul Campo—could launder narcotics proceeds and provide CS-1 with sensitive law enforcement information. As an example, below is an excerpt of a recorded phone call between CS-1 and Sensi on January 22, 2025. The full transcript is attached as Exhibit 1.[1]

> [CS-1]: Did you remember that we spoke about the guy who was working at the three letters, a friend of yours?
> [SENSI]: Yes, of course, of course.
> [CS-1]: What was the name of that guy?
> . . .
> [SENSI]: Paul Campo.
> [CS-1]: Ok, ok, ok, ok. So, what do you think of that guy?
> [SENSI]: I've known him for the better part of maybe 15 years. I think very highly of him, he's very close to me. I know him very, very well.
> [CS-1]: Do you trust him, Robert?
> [SENSI]: Oh, yeah, very much so. By the way, the two new people that are running that place, the brand new two people that are just coming now to power, he worked with them in New York. They worked on the streets together in New York years ago, so we have a very good entree now to the top two, I think maybe even the top three in that place, I mean the big ones, all the way to the top.
> . . .
> [SENSI]: Anyway, yeah, tell me what you need.
> [CS-1]: But what place?
> . . .
> [CS-1]: What place do we have the entrance?
> [SENSI]: Three letters, three letters, Washington D.C.
> [CS-1]: Huh? Yeah, but three letters with the D or with the C?

---

[1] The attached exhibits include draft transcripts and translations of underlying recordings and communications that are to be regarded merely as drafts. As such, they are not binding on the Government and are subject to change in the future.

[SENSI]: D, D, D, D.

. . .

[CS-1]: So, if we ask him for some kind of favors, do you think he can help us with the right amount of money?
[SENSI]: Of course. 100%. Yes.

. . .

[CS-1]: Okay, so, all right. So, two things, two favors. The first one is the most important, and the second one is important but not to this one. Like, for example, you know, like I get some info from someone that we are suspecting that is betraying us.
[SENSI]: Okay.
[CS-1]: That's one thing. Second, maybe a little bit because they are being hit, people are being hit in several places there in your country. So, really, maybe some kind of knowledge, how can we avoid, maybe not 100%, but how can we avoid, you know, the hits on us? You know, like a little knowledge.
[SENSI]: of course. Yeah, yeah.
[CS-1]: Right? And the last thing, an extra thing will be, like, is he an expert on the papers?
[SENSI]: 100%. He was in charge worldwide for that.

. . .

[SENSI]: A very big expert. Probably the biggest in the world.

. . .

[SENSI]: He's hired by many different companies to do that.
[CS-1]: Okay, do you think maybe he can help us to bankarize it?
[SENSI]: Of course.
[CS-1]: But, Robert, Robert, yeah, but look at Robert, are you sure he has the capability on that or he tells you or you already did some business with him?
[SENSI]: Look, I'll explain. I know him firsthand. Okay. I know him. He's not a man I know from the street for a week. I know him. I've worked with him for a long time.

After this call, CS-1 inquired as to the cost of Campo and Sensi's money laundering services. Below are screenshots of Sensi's response, in which he detailed the factors that would be relevant to him and Campo, including the denomination of the currency, the amount of proceeds across CJNG's operations in the United States, and the laundering method. Sensi also suggested an in-person meeting with him and Campo to discuss the details.[2]

 

In or about March 2025, CS-1 met with Sensi and Campo twice: once at a restaurant in Manhattan (the "New York Meeting") and a second time at a hotel in Tampa, Florida (the "Tampa Meeting"). Both meetings were recorded by CS-1 and lasted several hours.[3] During the New York Meeting, which occurred on March 10, 2025, CS-1 described, in substance and in part, "problems" that CJNG was having moving proceeds from the United States to Mexico. CS-1 explained, in substance and in part, that CJNG had operations across the United States and that he needed a reliable method of moving money. During the meeting, Sensi and Campo discussed a variety of methods for concealing and laundering these proceeds, including investing in real estate, converting the proceeds to cryptocurrency, and bulk cash smuggling. Campo, Sensi, and CS-1 agreed that, as an initial step and in order to build trust, CS-1 would provide them with several smaller installments of cash from CJNG's operations in North Carolina and Sensi and Campo would convert the cash into cryptocurrency and return it to CS-1. Campo and Sensi would charge CS-1 no more than 8% for this service.

During the Tampa Meeting, which occurred on March 26, 2025, Campo and Sensi agreed to launder up to $12 million, but Sensi was ready to launder more and pushed CS-1 to provide additional proceeds (Sensi: "Can we do more than 12? Brother, for real."). Sensi, Campo, and CS-1 also further discussed the initial delivery of proceeds for Campo and Sensi to launder into cryptocurrency (the "First Money Pickup"). Sensi agreed to pick up the money in Charlotte, North Carolina and CS-1 stated, in substance and in part, that he would contact Sensi when the money was ready to be delivered.

---

[3] Transcriptions of these meetings are in progress.

On June 3, 2025, CS-1 met with Sensi at a restaurant in Charlotte, North Carolina to execute the First Money Pickup. CS-1 recorded this meeting and the draft transcript is attached as Exhibit 2. Based on cellphone location data, Sensi traveled from the vicinity of his home in Boca Raton, Florida to Charlotte, North Carolina for the meeting. During the meeting, CS-1 delivered $200,000 to Sensi to be converted into cryptocurrency and returned to CS-1. Sensi again implored CS-1 to give him more work. For example,

> [CS-1]: Alright, so you have to go back on….As soon as everything goes well with this money
> [SENSI]: Yes
> [CS-1]: You have to go back on next Tuesday.
> [SENSI]: Here?
> [CS-1]: Yea
> [SENSI]: Yea no problem.
> [CS-1]: I have it all. You said
> [SENSI]: All of it. I need to work brother
> [CS-1]: It's 12
> [SENSI]: Huh?
> [CS-1]: 12.
> [SENSI]: No problem. Let's do it.

During the meeting, Sensi and CS-1 also discussed a range of other subjects including Sensi sourcing narcotics for CS-1, Sensi coordinating access to airports and ports for CJNG's operations, the weapons deal (see below), and the existence of high-level informants within Mexican drug cartels, including CJNG.

> [SENSI]: Yes, they have a lot of …(inaudible)… High level informants. High level informants have infiltrated the cartels. You're gonna find that strange. And in fact a couple guys that were just killed; one in Guadalajara, two in Guadalajara, were with your dad.[4] They were working with (inaudible)
> [CS-1]: Can we, can we know who was the informants?
> [SENSI]: We have to go see him, or wait for him to come here.
> [CS-1]: Who?
> [SENSI]: Mr. Grass.[5] I can tell him when I see him tomorrow. I'll tell him tomorrow.
> [CS-1]: You have to find me something.
> [SENSI]: So just tell your dad, be on the alert that's all, be alert.
> [CS-1]: Right now, no, Right now.
> [SENSI]: Can you imagine?
> [CS-1]: Bro.
> [SENSI]: Bastards have infiltrated, I guarantee you that's probably
> [CS-1]: But, Jalisco boss. He even said us.

---

[4] In conversations, CS-1, Sensi, and Campo referred to the leader of CJNG (Nemesio Oseguera Ramos, a/k/a "El Mencho) as CS-1's "dad."

[5] In conversations, CS-1 and Sensi referred to Campo as either "Billy" or "Mr. Grass."

> [SENSI]: Oh he said Sinaloa, and what's the other one. There's three major ones, well yours is now the biggest.

Sensi also speculated that Campo would soon be rehired by the DEA, which would only increase their ability to work for CS-1 and source law enforcement sensitive information.

> [SENSI]: He...He... look. They're trying to get him back.
> [CS-1]: Where where where?
> [SENSI]: To that place.
> [CS-1]: DEA?
> [SENSI]: mmhmmm
> [CS-1]: For real.
> [SENSI]: Yea... He ran the whole...the whole worldwide you know
> [CS-1]: So what is going to happen with that?
> [SENSI]: No no, we can work. Better, better. Much better.
> [CS-1]: You think so?
> [SENSI]: Of course. They want him to run down all the accounts. So we'll know everything. Who they're looking at.

Based on cellphone location data, after the First Money Pickup, Sensi traveled to northern Virginia and met with Campo, after which they both traveled to the vicinity of Campo's home in Oakton, Virginia. Less than four days later, Sensi, Campo, and their co-conspirators returned the laundered funds to a cryptocurrency wallet controlled by the DEA ("UC Wallet-1"). It appears that Sensi and Campo did not deposit and convert the physical cash that CS-1 provided to Sensi in Charlotte but instead tapped into other sources to conduct a series of transactions that concluded with several transfers of crypto currency to UC Wallet-1. This method of money movement, similar to a Hawala network, allowed the funds to be transferred across international borders without an easily traceable paper trail. However, the Government uncovered the following:



---

[6] Sensi disclosed Global Assets Tracking Corporation to Pretrial Services as a business that he has owned for several years that generates approximately $2,300 in income each month. However, Sensi provided no description of the nature of this business or its activities.

- On June 6 and June 7, 2025, UC Wallet-1 received several transfers of cryptocurrency totaling approximately $187,000. It appears that Sensi and Campo ultimately kept slightly less than the maximum expected fee of 8%. For each transfer, Sensi sent CS-1, via WhatsApp, a screenshot showing that the transfer had been initiated.

On September 17, 2025, CS-1, Campo, and Sensi communicated via WhatsApp to discuss the next delivery of narcotics proceeds for Campo and Sensi to launder. In sum and substance, Campo and Sensi agreed that Sensi would meet CS-1 on September 23, 2025 at the same location in Charlotte, North Carolina where they met for the initial delivery on June 3, 2025 (the "Second Money Pickup"). Screenshots of this conversation are below, in which Campo also indicates that he and Sensi took on another contract since the First Money Pickup.



On September 23, 2025, CS-1 met with Sensi in Charlotte, North Carolina to execute the Second Money Pickup. CS-1 recorded this meeting. Based on cellphone location data, Sensi again drove from the vicinity of his home in Florida to Charlotte, North Carolina. During the meeting, CS-1 delivered $300,000 to Sensi to be converted into cryptocurrency and returned to CS-1. Sensi placed the money in a black backpack.

Law enforcement conducting surveillance of the Second Money Pickup observed Sensi, after picking up $300,000 from CS-1,   Based on cellphone location data, the next day, Sensi returned to the vicinity of his home in Florida.

Only six days later, on September 29, 2025, UC Wallet-1 received a transfer of cryptocurrency totaling approximately $276,000—that is, $300,000 less Sensi and Campo's fee. The Government has yet to identify the owner of the wallet that sent this cryptocurrency. However, the Government uncovered the following:

- Based on a review of communications between Sensi and

---

[7] The Government is in the early stages of its review of electronic devices seized from Sensi and Campo. Accordingly, these and other communications cited herein were identified based on a limited review and likely do not reflect the full extent of incriminating communications in such materials.

[8] This message was sent in Spanish.



**The Narcotics Deal**

As detailed in the Government's January 5 Letter, on October 1, 2025, CS-1 met with Sensi in Boca Raton, Florida and offered Sensi and Campo an opportunity to participate in a narcotics conspiracy. This meeting was recorded.[9] In sum and substance, CS-1 proposed that Sensi and Campo convert cash into cryptocurrency to pay for the transportation of a shipment of narcotics to New York and after the shipment was released to CS-1, CS-1 would sell the narcotics and pay

---

[9] A transcription of this meeting is in progress.

Sensi and Campo a portion of the proceeds. The remaining proceeds would also be provided to Sensi and Campo, but to invest on behalf of CJNG in various opportunities.

On October 16, 2025, CS-1 met with Sensi in Manhattan, New York and delivered $250,000 to Sensi to be converted into cryptocurrency for the narcotics transaction.[10] This meeting was recorded by CS-1.[11] CS-1 directed Sensi to send the cryptocurrency to a particular wallet controlled by the Internal Revenue Service ("UC Wallet-2"), but which CS-1 told Sensi belonged to the owner of the narcotics they were purchasing. CS-1 explained, in substance and in part, that once the owner received these funds and released the product, CS-1 would deliver it to the buyers and receive $5,000,000 in proceeds that he would then deliver to Campo and Sensi. CS-1 said, in substance and in part, that if Campo and Sensi could send the cryptocurrency that day, he would be able to meet them the following day to deliver the $5,000,000. CS-1 explained this plan to Sensi in-person and then both of them called Campo and CS-1 reiterated the plan to Campo. After Sensi collected the money, law enforcement conducting surveillance followed him to the Diamond District in New York, where he was observed meeting with Edwin Maya Estrada and Campo.

Sensi and Campo initially represented that they would be able to convert the $250,000 into cryptocurrency on October 16, but were unable to do so.



---

[10] At the meeting on October 1, 2025, CS-1 told Campo and Sensi that he would deliver $500,000 to be converted to cryptocurrency, of which Campo and Sensi would keep $50,000 as a fee, in addition to their share of the narcotics proceeds. At the meeting on October 16, CS-1 explained that he no longer needed $450,000; he just needed $225,000. Accordingly, he was dropping $250,000 to Sensi (accounting for Sensi and Campo's 10% laundering fee).

[11] A transcription of this meeting is in progress.

On October 17, 2025, UC Wallet-2 received several smaller transfers of cryptocurrency. Later that day, Sensi called CS-1 and indicated that he and Campo were able to "bankarize" the funds, but had some "difficulties" with converting it to cryptocurrency. Sensi represented that the rest of the cryptocurrency would be transferred by October 18. On October 18, UC Wallet-2 received two transfers of cryptocurrency totaling, with the transfers from the previous day, approximately $225,000—that is, $250,000 less Sensi and Campo's fee. Upon confirmation of UC Wallet-2's receipt of these funds, CS-1 informed Sensi and Campo that he was taking possession of the product. In response, Campo wrote, in sum and substance, that Sensi could meet CS-1 as soon as needed. On December 4, 2025, Sensi traveled from Florida to New York by plane, where he believed he and Campo would meet with CS-1 to receive the narcotics proceeds. Sensi and Campo were arrested upon their arrival in New York.

Notably, this was not the first time during the conspiracy that Sensi agreed to undertake narcotics-related conduct. After Sensi's initial conversations with CS-1 in December 2024, Sensi attempted to source cocaine for CS-1. Specifically, Sensi proposed two sources of supply who had access to cocaine labs or "kitchens" in Colombia: Jeeison Javier Silva Suárez and Teodosio Pabon Contreras. Attached as Exhibit 3 is a draft transcript and translation of a January 16, 2025 call between Sensi and CS-1 in which they discuss meeting with both individuals in Bogota, Colombia to discuss sourcing cocaine. Pabon, a/k/a "el Profe," is currently a fugitive who was indicted in the Southern District of Florida in May 2022 for conspiracy to import cocaine, in violation of Title 21, United States Code, Section 963. Specifically, Pabon is alleged to have participated in a conspiracy to traffic at least several hundred kilograms, and possibly up to 1,500 kilograms, of cocaine from Cartagena, Colombia to Costa Rica, with an ultimate destination of the United States. *See* Dkt. 1, Complaint, *United States v. Pabon-Contreras*, 22 Cr. 20181 (SDFL). As part of that investigation, the Colombian National Police seized approximately 362 kilograms of cocaine from a farm outside of Cartagena, Colombia. Pabon remains a fugitive. Additionally, according to Sensi, Pabon has ties to the National Liberation Army or ELN ("ELN"), a violent Colombian guerilla group that the U.S. Department of State has designated as a Foreign Terrorist Organization ("FTO").[13] Sensi also claimed to CS-1 that Pabon worked closely with Dario Antonio Úsuga David, a/k/a "Otoniel," the former leader of the Gulf Clan, a powerful drug trafficking organization in Colombia that has also been designated as an FTO.

**The Weapons Deal**

As described in the Government's January 5 Letter, Sensi and Campo additionally agreed to procure military-grade weapons for CJNG. On or about June 3, 2025, at the First Money Pickup in Charlotte, CS-1 asked Sensi, in substance and in part, about procuring "toys" (i.e., weapons).

---

[13] According to open-source reporting, Pabon previously had ties to the United Self-Defense Forces of Colombia, a paramilitary group in Colombia.

Sensi confirmed and indicated that he and Campo are in that business, noting that they recently worked on a deal securing helicopters for the Iraqi government. CS-1 then provided Sensi a list of weapons, including AR-15s, M4s, M16s, .50 Cals, M60s, grenade launchers, and rocket propelled grenades. CS-1 also asked Sensi for drones that could hold several kilograms. *See* Exhibit 2. CS-1 later sent Sensi a wish list including weapons, drones, and C-4 explosives.

Over the course of the next several months, CS-1, Sensi, and Campo had multiple discussions regarding the weapons deal, including the following:

- Attached as Exhibits 4 and 5 are draft transcripts of calls between Sensi and CS-1 on June 30, 2025 and July 1, 2025, in which they discuss Sensi fulfilling the order through a variety of sources, including through contacts in Europe and ELN in Colombia.

- On July 16, 2025, CS-1, Sensi, and Campo met at a restaurant in Manhattan, New York, at which they discussed the weapons deal. In sum and substance, Sensi explained that the weapons were available in Brazil and CS-1 agreed to pay for Sensi to go to Brazil to examine the weapons. During this meeting, Sensi also proposed that CS-1 purchase C-4 explosives from Pabon, who he identified as a member of ELN. Sensi then proceeded to call Pabon and let CS-1 speak with Pabon. Pabon confirmed that he had access to C-4 explosives and could transport them internationally to Curacao. Attached as Exhibit 6 is a draft transcript of the call with Pabon and the conversation between CS-1, Sensi, and Campo leading up to and after the call with Pabon. Sensi subsequently attempted to set up a meeting between CS-1 and a representative of Pabon in Curacao, but Campo ultimately dissuaded CS-1 from attending due to security concerns.

- On July 30, 2025, CS-1 met with Sensi and provided him with $20,000 to travel to Brazil to vet the weapons. Attached as Exhibit 7 is a draft transcript of excerpts of that meeting during which Sensi and CS-1 discuss the weapons and drones that CS-1 wants to outfit with explosives.

And Sensi appeared poised to follow through on the weapons deal. As described in the January 5 Letter, Sensi sent CS-1 images and videos of weapons and shipping containers that Sensi told CS-1 were in Brazil and ready to be purchased. Sensi even sent CS-1 invoices for such weapons from third party entities.

**2. Risk of Flight – Sensi's Travel History, Foreign Contacts, and Access to Funds**

As detailed in the January 5, 2025 Letter, Sensi presents a tremendous risk of flight due to the significant penalties he is facing, and his demonstrated access to funds and contacts abroad that could facilitate his flight. At the hearing on January 16, the Court requested that the Government provide additional information regarding several areas relevant to risk of flight, which are addressed below.

**International Ties and Foreign Travel**

Sensi has significant international ties, most notably his wife, Paola Ruiz Sosa, and one of his sons, Steven Sensi, ███████████████████████.[14] Additionally, as Sensi reported to Pretrial Services, he has previously resided in Italy, Bolivia, Colombia, and Ecuador.[15] Moreover, Sensi's travel records reflect that he frequently travels abroad. In just approximately the past three years, since October 2022, Sensi has traveled internationally over two dozen times, including to Colombia, Ecuador, Costa Rica, and Bolivia. And during the charged conspiracy, that is from December 2024, Sensi traveled to Colombia three times, including as recently as November 8 to November 22, 2025.[16] Though the defense cites Sensi's medical conditions as a significant factor for the Court to consider in assessing his risk of flight, his frequent international travel belies that notion, especially when coupled with the extensive traveling he did as part of the charged conduct. At the hearing on January 16, the Court specifically raised the fact that Sensi recently suffered a fall and fractured two ribs. However, notably, a substantial amount of this travel, including an international trip to Colombia, occurred after Sensi sustained this fall, ████████████████████████████████.

As for Ruiz Sosa and Steven Sensi, the Government understands that ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Most recently, on October 10, 2025, she traveled from Florida to Bogota, Colombia and has not returned.

The Government understands that Steven Sensi ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.

Sensi also has substantial ties to a known international fugitive, Teodosio Pabon Contreras, who, as described above, is an alleged narcotics trafficker with ties to various paramilitary and

---

[14] The Government understands from the defense that Robert Sensi has been married twice previously. At least one of these individuals is a foreign national (Bolivian). The Government is unaware of their current locations.

[15] The Government is unaware of the time period or length of each of these residences.

█████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

narcotics trafficking groups, including, by Sensi's own assertion, an FTO. Sensi and Pabon have kept in close contact since Pabon was indicted in May 2022. Based on a review of Sensi's phone that was seized at the time of his arrest, since at least October 2023, Pabon and Sensi have exchanged hundreds of messages and phone calls, and appear to have contacted each other on a monthly basis, if not more frequently. Sensi's close ties to an individual who has evaded capture by law enforcement for over three years presents a unique risk that counsels strongly in favor of his continued detention.

**Access to Capital**

Based on Sensi's representations to Pretrial Services and the Government's investigation to date, the Government has not identified substantial traditional banking assets owned by Sensi.[17] However, as described in detail above, during the course of the offense conduct, Sensi and his co-conspirators repeatedly engaged the services of numerous individuals, including foreign nationals and those located abroad, to launder what they believed to be narcotics proceeds. In each instance, Sensi and his co-conspirators were able to successfully launder physical cash into cryptocurrency in a matter of days. This required the sophisticated movement of money through a variety of avenues, including traditional banking and cryptocurrency. Most notably, in several instances, ████████████████████████████████████████████████████████████ At bottom, Sensi's access to capital should not be defined solely by his bank accounts. ████████████████████████████████████████████████ Sensi has demonstrated an ability to access hundreds of thousands of dollars from a variety of sources, including those that are difficult to tie to a specific individual, such as cryptocurrency.

### 3. Medical Treatment in Custody

As described in the January 5 Letter, ████████████████████████████████████ Sensi is clinically stable, able to care for himself, and the treatment and monitoring of his medical conditions can be carried out at the Metropolitan Detention Center ("MDC"). However, at the end of December, MDC clinicians decided to transfer Sensi to a medical facility ███████████ so that he would be adequately protected from such risk. At ██████, Sensi is in a secure environment and receiving around-the-clock medical care.[18]

Sensi is of course subject to security protocols while at ██████. Because the facility is open to the public, the U.S. Marshals Service has implemented appropriate protocols to ensure the safety of inmates, staff, and other patients. The Government understands that Sensi is generally restrained to his bed or a chair in his room. This is a one-point restraint that consists of a handcuff on Sensi's ankle that is connected to the bed or the chair. When Sensi is walking around the facility, he may also have added restraints on his legs. At the hearing on January 16, the Court

---

[17] The Government is unaware, for example, of whether Sensi has any cryptocurrency assets, which is certainly plausible given the offense conduct here.

[18] Because Sensi's ████████████ is unlikely to be diminished, MDC clinicians expect that he will remain at ██████ for the foreseeable future.

highlighted the length of time that Sensi may be at ▮ during the pendency of this case. However, this is not something that is unique to Sensi. The Government understands that there are currently ▮ pretrial inmates housed at ▮, all of whom are subject to the same security protocols as Sensi. According to the U.S. Marshals, several of these inmates have been at ▮ for months, if not longer. In fact, recently a defendant in this district was housed at ▮ for over a year after being ordered detained pending trial. ▮

### 4. Sensi's Proposed Bail Package Is Insufficient

For the reasons set forth above, the Government respectfully submits that it has met its burden on both dangerousness and risk of nonappearance grounds, especially in a presumption case. Sensi, however, proposes that he be released on a $500,000 personal recognizance bond (co-signed by his son Stefano Sensi and secured by the equity in Stefano Sensi's home and business) and subject to home confinement and GPS monitoring.

The defendant's proposed bail package fails to adequately address concerns regarding his risk of flight and potential danger to the community. As an initial matter, nothing about the proposed bail package would prevent Sensi from continuing to engage in conduct similar to that charged here. Sensi, with his extensive rolodex of international contacts, including a known narcotics trafficker, could easily coordinate and facilitate money laundering conduct and narcotics trafficking from his place of confinement. And if travel were necessary to carry out this conduct, several individuals involved in the charged offenses, including ▮ ▮ would be free to do so on his behalf.

Furthermore, Sensi's access to a network of individuals with significant financial resources, as demonstrated by the offense conduct, and his ties to foreign nationals render his risk of escape from home confinement more than a mere possibility. In particular, Sensi's long-standing relationship with Pabon, himself a fugitive, gives the Government significant concern about a set of conditions that require Sensi's compliance for them to be effective. At bottom, Sensi is asking the Court to trust that he will remain in his home and not remove his GPS ankle monitor. The Government respectfully submits that the factors that strongly support a finding of serious risk of flight cannot be ameliorated by these conditions.



Finally, Sensi proposes his son, Stefano Sensi, as his co-habitant and sole co-signer.

[REDACTED]

\* \* \*

For all of the reasons stated above and in the January 5 Letter, the Court should continue the defendant's detention pending trial. Upon the filing of the defendant's response to this submission, the Government respectfully requests that the Court schedule a hearing so that the parties may address any remaining questions of the Court.

Respectfully submitted,

JAY CLAYTON
United States Attorney

by: _____
Varun A. Gumaste
Assistant United States Attorney
(212) 637-1023

cc:   Counsel of Record (by ECF and Email)